IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

SONYA HORTON,                    )
                                 )
          CLAIMANT,              )
                                 )
v.                               )        CIVIL ACTION NO. 4:16-CV-01671-KOB
                                 )
                                 )
NANCY A. BERRYHILL,              )
ACTING COMMISSIONER OF           )
SOCIAL SECURITY,                 )
                                 )
          RESPONDENT.            )
                                 )

MEMORANDUM OPINION

I. INTRODUCTION

On March 18, 2013, the claimant, Sonya Delores Horton, protectively applied for

supplemental social security income and disability insurance benefits under Titles II and XVII of

the Social Security Actbecause of degenerative disc disease of the cervical spine, history of

cervical spine fracture with fixation, degenerative disc disease of the lumbar spine, leg pain, and

HIV.  The Commissioner denied the claims initially on September 11, 2013 because of lack of

evidence. The claimant timely requested a hearing before an Administrative Law Judge, who

held a hearing on April 14, 2015. (R. 44-69, 99-103, 108-09).

In a decision dated May 14, 2015, the ALJ found the claimant not disabled under Title II

or XVII. The claimant filed a timely request for a hearing before the Appeals Council on May

20, 2015. The Appeals Council denied the claimant's appeal because the new evidence "was

1

about a later time" and did not "affect the [ALJ's decision] that the claimant was not disabled on or before the ALJ's decision."  Thus, the ALJ's decision became the final decision of the Commissioner on May 14, 2015. (R. 1-7, 26-43).

The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES AND REMANDS the decision of the Commissioner because the Appeals Council failed to adequately evaluate new, chronologically relevant, and material evidence.

## II. ISSUE PRESENTED

The issue before the court is whether the Appeals Council erred by failing to adequately evaluate the new, chronologically relevant, and material evidence that the claimant submitted to it dated after the ALJ's decision.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the ALJ applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity (RFC), and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is entitled to Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The issue in this case involves evidence submitted by the claimant to the Appeals Council dated after the ALJ's decision. Generally, a claimant may present new evidence at each stage of the administrative process. *Washington v. Comm'r of Soc. Sec. Admin.*, 806 F.3d 1317, 1320 (11th Cir. 2015). The Appeals Council has the discretion to not review the ALJ's denial of benefits. *See* 20 C.F.R. § 416.1470(b). But, in making its decision whether to review the ALJ's

decision, the Appeals Council "must consider new, material, and chronologically relevant evidence" that the claimant submits. *Hargress v. Soc. Sec. Admin.*, 874 F.3d 1284, 1290-91 (11th Cir. 2017); *Washington*, 806 F.3d at 1320.

Evidence is material if a reasonable possibility exists that it would change the administrative result. *Washington*, 806 F.3d at 1321. Evidence is chronologically relevant if "it relates to the period on or before the date of the [ALJ] hearing decision." *Hargress*, 874 F.3d at 1291. Medical opinions based on treatment occurring after the date of the ALJ's decision may still be chronologically relevant if the records relate to the period on or before the date of the ALJ's decision. *Washington*, 806 F.3d at 1323. The claimant can show that a medical opinion dated after the ALJ's decision is chronologically relevant if it is based on a "review of the claimant's medical history and [her] report of symptoms during the relevant time period and there was no evidence of a decline in [her] condition since the ALJ's decision." *Ashley v. Comm'r of Soc. Sec. Admin.*, 707 F. App'x 939, 944 (11th Cir. 2017) (citing *Washington*, 806 F.3d at 1322-23); *see also Hargress*, 874 F.3d at 1291 (discussing *Washington*, 806 F.3d at 1319, 1322-23).

This court has the authority to remand a case based on such new, material, and chronologically relevant evidence pursuant to 42 U.S.C. §405(g) under a sentence four remand or reversal. *See* 20 C.F.R. §§ 404.940, 404.946. "To obtain a sentence four remand, the claimant must show that, in light of the new evidence submitted to the Appeals Council, the ALJ's decision to deny benefits is not supported by substantial evidence in the record as a whole." *Hearn v. Soc. Sec. Admin.*, 619 F. App'x 892, 894 (11th Cir. 2015) (citing *Ingram v. Comm'r Soc. Sec. Admin.*, 496 F.3d 1253, 1266-67 (11th Cir. 2007)). When the evidence submitted to the

Appeals Council "undermine[s] the substantial evidence supporting the ALJ's decision," the Appeals Council errs in failing to review the ALJ's decision. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 785 (11th Cir. 2014). "The Appeals Council must grant the petition for review if the ALJ's 'action, findings, or conclusion is contrary to the weight of the evidence,' including the new evidence." *Hargress*, 874 F.3d at 1291 (citing *Ingram*, 496 F.3d at 1261.

## V. FACTS

The claimant was twenty-eight years of age at the time of the ALJ's final decision; has an eleventh-grade education; has past substantial gainful experience as fast food worker, a poultry grader and re-hanger, and a housekeeper in healthcare; and alleges disability based on degenerative disc disease of the cervical spine, history of cervical spine fracture with fixation, degenerative disc disease of the lumbar spine, leg pain, and HIV. (R. 63, 69, 554).

### *Physical Impairments*

On July 26, 2006, the claimant fractured her C6 disc in her spine in an automobile accident. An MRI dated July 30 revealed that the claimant had an inferior cervical spine injury including C6-C7 subluxation; a tear on the C6-C7 interspinous ligament; suggestion of facet joint changes; and minimal to mild spinal cord compression predominately toward the left of her C6-C7 disc. On July 31, Dr. Terry M. Andrade, a surgeon at Gadsden Regional Medical Center, performed surgery to reduce pressure on and fix the discs in her neck. Doctors discharged the claimant on August 4, 2006 with instructions for her to wear a hard collar neck brace at all times and a prescription for Norco 10 for pain and Soma as a muscle relaxer. (R. 364-65, 409, 425, 430-33, 440, 467).

From August 8, 2006, until January 16, 2007, Dr. Andrade treated the claimant nine times for neck discomfort and follow-ups from her accident and spine surgery. During several visits, Dr. Andrade counseled the claimant on the importance of not loosening her cervical collar. On September 12, 2006, Dr. Andrade reported that the claimant had "pulled her previous instrumentation apart by not wearing her cervical collar as instructed." Consequently, on September 18, Dr. Andrade performed an open reduction surgery with internal fixation of the claimant's C6-C7 disc; anterior cervical decompression with discectomies, neural foramintomies, and fusion; and a Bremer halo brace placement on the claimant's neck. (R. 453). (R. 521-523, 527-538, 541-552).

After the claimant's surgery, between September 2006 and January 2007, she complained of constant neck pain, and Dr. Andrade treated her with several medications at different times, including Lorcet Plus, Oxycodone, Darvocet, and Butalbital Acetaminophen. By late October, Dr. Andrade reported that the claimant could return to regular work duty in six weeks at the latest on December 13, 2006. In follow-up appointments on October 31, and November 2, 2006, Dr. Andrade instructed the claimant that if she tried to remove the halo neck brace again she would have to find another doctor. (R. 521-43).

On January 25, 2007, Dr. Andrade treated the claimant because she improperly wore her neck brace, and noted the claimant's collar brace was "extremely loose and cut her where it was totally ineffective." By February 13, 2007, the claimant's pain in her neck had improved some and her condition was stable. (R. 458, 518-20).

Between February 2007 and February 2011, the record contains no reports of medical visits for the claimant for neck or back pain. On February 1 and 9, 2011, Dr. Alan Pernick at

Doctors Medical Care of Gadsden treated the claimant for neck and lower back pain.  An x-ray of her neck and back showed minimal to mild spondylosis at the C6-C7 disc and mild rotatory lumbar dextroscoliosis in her lumbar spine.  The claimant reported that "she does a lot of twisting at work" that increases her pain. (R. 559-60, 566).

The claimant was involved in another automobile accident on October 14, 2012.  Dr. Djiby Diop at Gadsden Regional Medical Center Emergency Room treated the claimant for neck and lower back pain on October 15, 2012 because of the accident. Diagnostic x-rays revealed partial sacralization of the L5 disc with concurrent congenital spina bifida occulta, which can cause pain, weakness, and numbness, and no definite evidence of any new acute bone disease. (R. 510-511).

On November 26, 2012, Dr. Royce Jones, a chiropractor at Jones Chiropractic Clinic, initially treated the claimant for neck and back pain arising from her two accidents.  Dr. Jones reviewed the claimant's x-ray of her cervical spine and found moderate intervertebral disc space narrowing at C5-C6 disc; mild space decrease at C7-T1 disc; degenerative osteoarthritis at C5 disc; straightened cervical lordotic curve; and forward translation at C3-C4, C4-C5, and C5-C6/C7 fusion.  The claimant's x-ray of her lumbar spine revealed mild disc narrowing and atrophy at L5-S1; right lateral tilt of the pelvis; and sacralization of L5 with bilateral spatulaization of transverse processes. During his initial physical examination of the claimant, Dr. Jones found that she had moderately restricted range of motion with pain in her cervical spine; neck pain in extension and right and left lateral flexion; mildly to severely restricted range of motion in her lumbar spine; and spasms and tenderness throughout her back and neck.  Dr. Jones recommended spinal adjustments, icing, and manual traction. (R. 505-509).

After his initial examination, Dr. Royce Jones treated the claimant for neck and back pain twenty-one times from December 5, 2012 to August, 14, 2013. On December 5, 2012, the claimant complained of constant, dull pain with stiffness and soreness "of a severe degree" in her back; she complained of mild frequent dull pain with stiffness and soreness in her neck bilaterally; she stated that her neck pain is "improving"; she has occasional headaches; and she rated her pain as a seven on a ten point scale. Dr. Jones determined that the claimant could resume normal work activities immediately on December 3, 2012. (R. 574, 625).

From December 2012 to August 2013, the claimant complained to Dr. Jones about her moderate pain, stiffness, and soreness in her back and neck; she stated that her pain displays "some progress" and "is progressing"; and she rated her pain ranging between a four and a six on a ten point scale. Dr. Jones assessed that the claimant's condition either improved or remained the same after each treatment. Dr. Jones found that the claimant has signs of misalignment in her right upper cervical spine. Notably, Dr. Jones's examination of the claimant in March 2013 showed that the claimant's cervical and lumbar spine range of motion were normal to moderately restricted with pain, and that she had spasms and tenderness throughout her back and neck. X-rays from March 11, 2013 showed moderate intervertebral disc space narrowing at C5-C6 disc; mildly decreased space narrowing at C7-T1; and degenerative osteoarthritis at C5, C3, C4, C5, and C6 discs. Dr. Jones's impression included cervicocranial syndrome, lumbar radiculitis/neuritis, and cervical and lumbar sprain/strain. On October 1, 2013, Dr. Jones found that the claimant continued to suffer from limited range of motion in her neck and spasms and tenderness throughout her back and neck. He ended the claimant's treatment because of a lack of response to treatment and advised her to see an orthopedic surgeon. (R. 576-618).

Dr. Anand S. Iyer, an internist at Canterberry Family Practice Center, reviewed the claimant's medical history and personally evaluated the claimant on August 31, 2013 at the request of the Disability Determination Services. The claimant told Dr. Iyer about her constant neck ache with radiation of pain down her back; left arm weakness and tingling; tendency to drop objects in her left hand; occasional use of her neck brace; and pain standing for extended periods of time and turning her head. Dr. Iver noted the claimant's previous cervical spine fracture, status post discectomy and fusion, and lumbar disc degenerative disease.

Dr. Iyer's physical examination revealed that the claimant had a normal gait; ability to get on and off the exam table; normal hand grip strength; ability to walk on heals and tiptoes and to squat; and full range of motion in her back, shoulders, hands, hips, elbows, knees, ankles, and feet. However, Dr. Iyer's examination showed that the claimant had positive signs of neck pain; a positive straight leg test indicating pain down the back of her legs; and limited flexion and rotation in her neck. Specifically, her neck flexion was 20 degrees out of 50; extension was 30 degrees out of 60; right and left lateral flexion was 20 degrees out of 45; and her right and left rotation was 30 degrees out of 80. Dr. Iyer opined that the claimant "may have some impairment of functions involving: turning [her] head, standing, bending, lifting, twisting, and carrying." However, he found that she "does not have significant limitation of functions involving: sitting, hearing, walking, standing, handling, and speaking." (R. 554-557).

A year later, on September 30, 2014, the claimant began treatment with Dr. Muhammad Tariq, an internist at Quality of Life, because the pain in her upper and lower back and neck had increased to a ten out of ten on the pain scale. The claimant indicated that bending, lifting, lying/resting, and twisting aggravated her pain. On physical examination, Dr. Tariq found

muscle spasms in the claimant's cervical, thoracic, and lumbar spine. He diagnosed the claimant with cervicalgia or radiating and stiff neck pain; prescribed the claimant diclofenac sodium for pain and inflammation and Flexeril for pain; and recommended back exercises. (R. 646-649, 662).

On October 1, Dr. Tariq ordered an x-ray of the claimant's cervical spine and diagnosed her with cervicalgia and degenerative disc disorder. Dr. Tariq treated the claimant for lower back and neck pain again on November 10, 2014. In addition to her accounts at the September 30 visit, the claimant noted she had numbness in both arms and increased pain when rolling over in bed, standing, and walking. Dr. Tariq found muscle spasms in the claimant's cervical and lumbar spine. In addition to his previous prescriptions for pain and inflammation, Dr. Tariq added a prescription for Neurontin for pain. (R. 651-655).

The claimant returned to Dr. Tariq on February 10, 2015 with back and neck pain rated at an eight out of ten on the pain scale. She continued to report that bending, pushing, rolling over in bed, standing, twisting, flexing and rotating her neck, and sitting for prolonged periods of time aggravated her pain. Again, Dr. Tariq found muscle spasms in the claimant's cervical and lumbar spine with mildly reduce range of motion. Based on his treatment of the claimant, Dr.Tariq filled out a "Physical Capacities Form" and assessed that she can sit upright in a standard chair for one hour at a time; can stand and walk for less than 30 minutes at one time; needs one hour in an eight-hour work day to lie down, sleep, or sit with her legs propped at waist level or above. Dr. Tariq found that these limitations dated back to January 4, 2014 and were expected to last for more than 12 months. Dr. Tariq continued the claimant's prescription for Neurotin, Flexeril, and diclofenac sodium. (R. 643-644, 656, 660).

*ALJ Hearing*

At the ALJ hearing on April 14, 2015, the claimant alleged an amended onset date of April 1, 2014. She also revealed her new diagnosis of HIV positive she received from doctors at the Health Department.  (R. 47).

The claimant testified about the origin of her injuries. She was in a car accident in 2006; broke two bones in her neck, which required a fusion and surgery; and had to re-learn how to walk after not being able to walk for seven months. In a subsequent 2012 car accident, the claimant flipped off a cliff and rolled six times, which "shook" her up and broke some of her ribs. (R. 53-54, 57).

The claimant testified that she takes Gabapentin, Flexeril, and Ultram for her pain. The claimant disclosed to Dr. Tariq that these medications cause drowsiness, dizziness, and nausea; these side effects start thirty minutes after she takes the prescriptions and last for a couple of hours. Dr. Tariq continued the prescriptions despite the claimant's disclosure of her side effects. She copes with these side effects by icing her back six times a day to reduce inflammation and pain; sleeps off her headaches that occur two or three times a day; spends half of the day lying down or sleeping to relieve her pain; rates her neck pain as an eight and her back pain as a ten on a ten-point scale; and goes to Gadsden Regional Emergency Room "at times" when her back pain is unbearable. (R. 50, 58-59).

The claimant testified that she does not have healthcare insurance. She could afford to see regular treatment doctors but could not afford to see an orthopedic specialist for these injuries. She cannot receive nor afford stronger medication. She has been unable to get treatment for HIV

because she does not have insurance to cover the screening cost. She had chiropractic physical therapy after her 2012 accident. (R. 51, 55, 58).

The claimant testified about her typical day. She has two children, ages five and seven; they stay with the claimant's mother 80-85% of the time because the claimant needs help with her children financially and physically. She cannot get her own groceries because she cannot carry "too many bags"; can pick up ten pounds but it strains her neck and back; can sit in a normal chair for forty-five minutes without having to change positions; can only stand for thirty minutes before her legs and back hurt; gets headaches two or three times a day; and takes naps and Flexeril to reduce her pain. (R. 51-54, 60).

She occasionally drinks alcohol and has not smoked marijuana since April 1, 2014, her onset date. The claimant testified that her marijuana and alcohol use has never prevented her from working. Her inability to turn her neck without pain has affected all of her previous jobs and contributed to her poor performance and eventual firing at Koch's and Firehouse Subs. (R. 61-62).

The claimant testified that she worked at Koch's after her 2012 car accident by "will power, wearing a brace every day, thinking about [her] kids, and bills." Eventually, she could not work at Koch's anymore because it took a "toll" on her, and Koch's fired her for missing shifts and leaving work early because of her pain. She then worked at Firehouse Subs for three or four months after April 1, 2014 because of the lighter work, but she still had pain and stress in her back. Firehouse Subs fired her because she could not lift the chairs; could not stand on her feet for "numerous hours"; and had to miss shifts and leave early because of her pain. (R. 48-49, 53-54, 56-57).

The vocational expert, Marissa Howell, listed the claimant's past relevant work as a fast food work, classified as light and unskilled work; a dressed poultry grader, classified as light and semi-skilled work; a poultry re-hanger, classified as medium and unskilled work; and a housekeeper in healthcare, classified as medium and unskilled work. (R. 63).

In his first hypothetical, the ALJ asked Ms. Howell to assume that an individual of the claimant's age, education and past work experience who could perform work at the light exertional level; could sustain a full eight-hour workday; would never be off task as long as she had a fifteen minute break in the morning and afternoon with an hour lunch break to recover from the side effects of her medications; could not climb ladders, ropes, or scaffolds; could occasionally kneel, crouch, and crawl; could frequently climb stairs and ramps; and could frequently balance, stoop, reach, handle, finger, and feel. Ms. Howell responded that the individual could perform the claimant's past work as a fast food worker and as a grader. (R. 64-65).

In his second hypothetical, the ALJ asked Ms. Howell to assume all of the prior limitations and added that the hypothetical person had the following limitations in her neck: 20 degree out of 50 flexion; 30 degree out of 60 rotation; 20 degree out of 45 right and left lateral flexion; and 30 degree out of 80 right and left rotation. Ms. Howell responded that the individual could do the claimant's past work as a fast food worker. (R. 65).

The ALJ then asked Ms. Howell if any additional jobs exist in the national or regional economy that the claimant could perform with the forgoing limitations. Ms. Howell responded that the individual could work as a garment sorter, classified as light and unskilled work with 1,900 jobs in Alabama and 206,600 jobs nationally; a laundry folder, classified as light and

unskilled work with 13,290 jobs in Alabama and 426,670 jobs nationally; and a label coder, classified as light and unskilled work with 10,920 jobs in Alabama and 363,000 nationally. (R. 65-66).

The ALJ then asked Ms. Howell to assume all of the prior limitations and added that after an hour of work the individual would need a fifteen-minute break to get over nausea and pain; could work for another hour; would then require another thirty-minute break for nausea and pain; and then could work for another hour. Progressively these breaks would amount to more break time that work time. Ms. Howell responded that these limitations would not be acceptable in a work environment. (R. 66).

Ms. Howell testified that anything above two consecutive days of absenteeism is unfavorable and that no jobs existed for an individual who could not maintain attention, concentration, persistence, or pace for a period of two hours or longer.  (R. 67).

*ALJ Decision*

The ALJ rendered an unfavorable decision to the claimant on May 14, 2015, and determined the claimant was not disabled from April 1, 2014 through May 14, 2015. The ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2019, and had not engaged in substantial gainful activity since April 1, 2014, the alleged onset date. (R. 29, 31).

The ALJ found that the claimant has the severe impairments of degenerative disc disease of the cervical spine, history of cervical spine fracture with fixation, and degenerative disc disease of the lumbar spine.  The ALJ found the claimant's HIV diagnosis non-severe because

14

she had submitted no medical evidence regarding the HIV diagnosis and, even if such evidence was in the record, she admitted that her HIV was asymptomatic. (R. 32).

The ALJ found that after considering all the evidence, the claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, the ALJ stated that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. The ALJ noted that, while the claimant alleged that she was unable to work because of her neck and back injuries sustained in her two accidents, she continued to work after both accidents. Although the claimant alleged that her neck and back pain worsened over time, the ALJ found no objective evidence after her second accident to confirm her statement; improvements with her chiropractic therapy; and no objective medical evidence to confirm the claimant's statements that she has two or three headaches a day. (R. 35-36).

The ALJ assigned partial weight to the opinion of consulting, examining physician Dr. Iyer because he did not offer any details about the nature of the claimant's limitations. The ALJ noted that Dr. Iyer's opinion was "self-contradicting" because he said the claimant may have *some* impairment standing, but then said she would have *no significant* limitation with standing. (R. 36).

The ALJ also assigned little weight to the opinion of treating physician Dr. Tariq because he only met with the claimant on three occasions before assessing her physical limitations and because his assessment was inconsistent with his own treatment notes that only revealed muscle spasms and mildly reduced range of motion. (R. 36).

The ALJ attributed some weight to the opinions of Dr. Andrade on December 13, 2006 and Dr. Jones on December 3, 2012 that the claimant could return to work after each of her accidents even though the claimant reported ongoing pain. (R. 36).

The ALJ determined that the claimant has the residual functional capacity to perform light work and

> sustain a full-eight hour workday and will never be off task during an eight-hour workday as long as she has regularly scheduled breaks normally allowed in the workplace by an employer. She can work a full eight-hour workday where there is no requirement to climb ladders, ropes, or scaffolds. The claimant can occasionally kneel, crouch, and crawl; frequently climb stairs and ramps; and frequently balance, stoop, reach, handle, finger, and feel. She has also demonstrated reduced range of motion of the cervical spine: Normal flexion is 50 degrees, while the claimant's actual flexion was 20; normal extension is 60 degrees, actual was 30; normal right lateral flexion is 45 degrees, actual was 20; normal left lateral flexion is 45 degrees, actual was 20; normal right rotation is 80 degrees, actual was 30; and normal left rotation is 80 degrees, actual was 30.

(R. 32). Based on the claimant's age, education, work experience, residual functional capacity, and the vocational expert's testimony, the ALJ determined that the claimant could perform her past relevant work as a fast food worker. He also found that other work exists in significant numbers in the national economy that the claimant could perform, including work as a garment sorter, a laundry folder, and a label coder. Therefore, the ALJ determined that the claimant was not disabled under the Social Security Act. (R. 37-38).

*Additional Evidence Submitted to Appeals Council*

After the ALJ rendered his decision, the claimant's attorney submitted additional evidence to the Appeals Council to support her claim for disability. The claimant submitted a

record from the Alabama Department of Public Health for a sexual health screening on May 6, 2014, indicating that she tested positive for HIV. (R. 671, 741).

On June 16, 2015, the claimant presented to the Emergency Department at Riverview Regional Medical Center complaining of severe back pain. Dr. Vinod Bansal diagnosed the claimant with chronic back pain and prescribed Flexeril and Toradol for pain. (R. 15-17).

At the request of the claimant's attorney, Dr. Jay Ripka, at Family First Health Clinic, evaluated the claimant on July 5, 2015. After reviewing the claimant's medical history, Dr. Ripka noted an x-ray in 2012 that revealed that the claimant has a congenital spina bifida occulta; he opined that condition has not been properly assessed and may be the cause of the claimant's back pain. His physical evaluation of the claimant showed that the claimant had tenderness in her right knee; pain in her neck; 45 degree right and left rotation in her neck; 20 degree right and left flexion in her neck; no reflexes in her upper and lower extremities; pain in her back; and weak grasp with her hands. (R. 11-14).

Dr. Ripka filled out a "Physical Capacities Form" that indicated that the claimant can sit upright in a standard chair for thirty minutes at a time; stand for two hours at one time; walk for fifteen minutes at one time; needs to lie down, sleep, or sit with her legs propped for three hours in an eight-hour workday. He stated that the claimant's past surgeries in her neck, chronic pain in her lower back and neck, tingling in all of her extremities, chronic fatigue, and spinal bifida occulta caused these assessed limitations. Dr. Ripka specifically noted that his opinion assessed the claimant's limitations dating back to April 1, 2014. (R. 10).

Dr. Tariq again treated the claimant for chronic back pain on October 7, 2015. He prescribed cyclobenzaprine for pain and stiffness from muscle spasms, diclofenac sodium for pain and inflammation, and Neurontin for pain. (R. 8).

The Appeals Council "looked at" the claimant's new evidence and concluded that it was "about a later time" and did not "affect the [ALJ's] decision" that the claimant was not disabled on or before the ALJ's decision. (R. 2).


VI. DISCUSSION

The claimant argues that the Appeals Council committed reversible error by not properly evaluating the claimant's additional medical evidence submitted and dated after the ALJ's decision. The court agrees and finds that the Appeals Council committed reversible error in failing to review the ALJ's decision in light of the new, chronologically relevant, and material evidence.

The evidence that the claimant submitted to the Appeals Council dated after the ALJ's decision was new, material, and chronologically relevant. In finding that the evidence was "about a later time," the Appeals Council in essence based its decision to not review the case on its finding that the new evidence was not chronologically relevant. *See Hargress*, 874 F.3d at 1286. That finding was error.

The medical evidence that the claimant submitted to the Appeals Council in this case dated after the ALJ's decision was both new and chronologically relevant.[1] All of the medical records submitted to the Appeals Council dated after the ALJ's decision were new because they

---

[1] The evidence relating to the claimant's HIV diagnosis pre-dates the ALJ's decision, and he discussed that diagnosis in his ALJ decision. Therefore, the court will not address this evidence as new, material, or chronologically relevant.

were not in existence at the time of the ALJ's decision. Also, Dr. Ripka's opinion regarding the claimant's limitations caused by her neck and back pain "relates to the period on or before the date of the [ALJ] hearing decision." *See Hargress*, 874 F.3d at 1291. Dr. Ripka physically examined the claimant; reviewed her past medical records; and specifically noted that his assessed limitations of the claimant dated back to April 1, 2014. *See Ashley*, 707 F. App'x at 944 (finding that a medical opinion is chronologically relevant if it is based on a "review of the claimant's medical history and [her] report of symptoms during the relevant time period and there was no evidence of a decline in [her] condition since the ALJ's decision.").

The June 16, 2015 records from the Riverview Emergency Department and the October 7, 2015 records from the claimant's treating physician Dr. Tariq were also chronological relevant. Those records show that the claimant *continued* to suffer from the same chronic pain she had complained of for many years and relate back to her condition prior to the ALJ's decision. Those records do not indicate that her condition worsened but reveal that her chronic pain continued after the ALJ's decision. The court finds that these records and Dr. Ripka's medical opinion of the claimant's limitations were chronologically relevant.

Moreover, Dr. Ripka's medical opinion regarding the claimant's limitations was material because it creates the reasonable possibility that the ALJ would have changed his decision if he had that opinion at the time of his decision. Dr. Ripka's opined that the claimant's 2012 x-ray revealing congenital spina bifida occulta had not been properly assessed and could be the cause of the claimant's pain. A reasonable possibility exists that the ALJ may have assessed the claimant's pain differently had he had Dr. Ripka's opinion and records at the time the ALJ rendered his decision.

The ALJ gave "little weight" to the opinion of the claimant's *treating* physician Dr. Tariq because he only treated the claimant three times and because his assessment was inconsistent with his own treatment notes that revealed muscle spasms and a mildly reduced range of motion. The ALJ ignored Dr. Tariq's assessment that the claimant had standing and sitting limitations. However, the ALJ gave "partial weight" to the consulting examiner Dr. Iyer who only saw the claimant one time; the ALJ noted that Dr. Iyer's opinion was "self-contradicting" because he said the claimant may have *some* impairment standing, but then indicated that the claimant had no *significant* limitation standing. Yet, he gave Dr. Iyer's opinion more weight than that of the treating physician Dr. Tariq when the ALJ claimed both doctors' opinions were in some way inconsistent or contradicting. See *Lewis v. Callahan*, 125 F.3d 1436, 1440-41 (11th Cir. 1997) (The ALJ must credit the opinions of treating physicians over those of consulting physicians unless good cause exists for treating the opinions differently.)

In assessing the claimant's residual functional capacity, the ALJ did not account for even the possibility that the claimant may have the standing and sitting limitations espoused by treating physician Dr. Tariq and the standing limitation assessed by Dr. Iyer. The ALJ simply ignored both of those opinions as they related to standing or sitting limitations. However, the new evidence submitted to the Appeals Council, Dr. Ripka's "Physical Capacities Form," supports both Dr. Tariq and Dr. Iyer's assessed limitations of the claimant regarding sitting and standing during an eight-hour work day. Had the ALJ had Dr. Ripka's assessment before making his decision, the ALJ would have had a treating physician and two examining physicians stating that the claimant was more limited than the ALJ's residual functional capacity assessment

of the claimant. A reasonable possibility exists that Dr. Ripka's opinion may have altered the ALJ's decision, or at least, altered the hypothetical posed to the vocational expert.

The court concedes that the June 16, 2015 Riverview Regional Medical Center records and Dr. Tariq's October 7, 2015 records alone may not have changed the ALJ's decision. However, those records, along with Dr. Ripka's opinion of the claimant's limitations that supports treating physician Dr. Tariq's opinion, undermine whether substantial evidence would support the ALJ's decision and create a reasonable possibility that the ALJ may have changed his decision had he had those records before him. The court finds that the Appeals Council failed to adequately consider the new, material, and chronologically relevant medical evidence submitted to it after the ALJ's decision.

Other Concern

The court is also concerned about whether the ALJ properly assessed little weight to treating physician Dr. Tariq. The ALJ indicated that it gave little weight to Dr. Tariq's opinion because he saw the claimant only three times. However, that reason lacks merit in light of the ALJ giving consulting, examining physician Dr. Iyer more weight when he only saw the claimant on one occasion. Moreover, the court questions whether Dr. Tariq's assessment contradicts his own treatment records. Dr. Tariq's finding that the claimant had a mildly reduced range of motion does not negate his limitations findings. Dr. Tariq found muscle spasms in the claimant's cervical, thoracic, and lumbar spine each time he physically examined her from September 2014 through February 10, 2015. Those findings, along with the claimant's chronic pain and numbness complaints, would support the limitations he assessed for the claimant.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 20th day of March, 2018.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE